(No. 6512.   July 1, 1938.)

NELLIE WHITE HUBBARD, Appellant, v. LEONARD G. BALL, Executor of the Estate of GEORGE A. WHITE, Deceased, Respondent.

[81 Pac. (2d) 73.]

Hoyt Ray, for Appellant.

A. A. Merrill, for Respondent.

MORGAN, J.—George A. White died, testate, March 27, 1936. Leonard G. Ball, respondent, is executor of his will, and Nellie White Hubbard, appellant, is a devisee and legatee named therein. Respondent filed a claim against the estate for $1,125, $1,000 thereof being claimed for services rendered by him in caring for the testator, and for his property, during his lifetime. One hundred twenty-five dollars of the claim was for expenses incurred in visiting the testator, in North Carolina, at his written request and on his written promise to pay respondent for expenses incurred in making the trip.

■ Appellant contends the $1,000 item is barred by I. C. A., sec. 5-217, being the four-year statute of limitations, which relates to contracts, obligations and liabilities not founded on written instruments. This contention is based on the fact that the services rendered by respondent to White, and in caring for his property, were performed pursuant to an oral agreement, or understanding, between them, entered into in 1931. Section 15-610 is as follows:

"No claim must be allowed by the executor or administrator, or by the probate judge, which was barred by the statute of limitations, at the time of the death of the decedent. . . . ."

The evidence shows the services were continuous, as needed, from their commencement in 1931 until White's death. The period of limitation commenced to run at the end of the performance of the services (*McCarthy v. Paris*, 46 Ida. 165, 267 Pac. 232), therefore, the claim is not barred.

■■ Appellant also insists the claim is rendered unenforceable by the statute of frauds. She apparently relies on sec. 16-505, subd. 1, as follows:

"In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence therefore, of the agreement can not be received without the writing or secondary evidence of its contents:

"1. An agreement that by its terms is not to be performed within a year from the making thereof."

This contention cannot be maintained. The rule applicable is thus stated in the second section of the syllabus in *Seder v. Grand Lodge, A. O. U. W.*, 35 Ida. 277, 278, 206 Pac. 1052:

"An agreement which, by its terms, is not to be performed within a year from the making thereof, is invalid and void unless the same, or some note or memorandum thereof, be in writing and subscribed by the party charged or his agent. But where the termination of a contract is dependent upon the happening of a contingency which may occur within a year it is not within the statute of frauds, although the contingency may not take place until after the expiration of a year." See, also, *Darknell v. Coeur d'Alene etc. Transp. Co.*, 18 Ida. 61, 108 Pac. 536.

██ ██ The latter case disposes of another of appellant's contentions, to wit: That respondent has occupied inconsistent positions in that he sought to recover in the probate court on an oral contract with White, for compensation for caring for him and his property, and in the district court on *quantum meruit*. This court, in the Darknell case, 18 Ida. 61, 67, 108 Pac. 536, 538, said:

"The only question which seems to arise in the case is whether the plaintiff could recover on a stipulated price or must recover on *quantum meruit*. The two theories are not inconsistent. Indeed, if the plaintiff should succeed in proving that he rendered the services and should be unable to prove that he had a contract for a specific salary, then he would be clearly entitled to recover the reasonable value of the services, provided his complaint contains a count on *quantum meruit*. Under the statute (subd. 1, sec. 4169) [I. C. A., sec. 5–606] causes of action arising out of 'contracts express or implied' may be joined. So a cause of action on an express contract for a fixed salary may be joined with a cause of action for the same service on an implied promise to pay the reasonable value thereof."

The claim for the $1,000 is: "For looking after George A. White's business, and caring for him during his sickness from 1930 until the date of his death $1,000.00." The

record discloses that the year 1930 is erroneous and that the services commenced in 1931. The claim does not show whether it is based on an agreement between respondent and White, or on the reasonable value of the services. The law does not require a claimant to specify whether his claim is based on express contract or *quantum meruit* and, as pointed out in the Darknell case, the two theories are not inconsistent.

▉ Respondent testified as to services rendered by him for deceased and as to the value thereof. In appellant's brief, it is said:

"It is our contention that Ball, as claimant for one thousand dollars for personal services must prove independently of his own testimony, both performance of the services and the reasonable value of same, because of his incompetency as a witness." (*Nelson v. Bruce*, 51 Ida. 378, 6 Pac. (2d) 140.)

The cited case does not support the contention.

Prior to the amendment of sec. 7936, Idaho Compiled Statutes, it would have sustained her contention. That section provided:

"The following persons can not be witnesses: . . . .

"3. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any matter of fact occurring before the death of such deceased person."

See *Rice v. Rigley*, 7 Ida. 115, 61 Pac. 290; *Goldensmith v. Worstell*, 35 Ida. 679, 208 Pac. 836. That section was amended by 1927 Sess. L., chap. 51, page 67, and is now a part of I. C. A., sec. 16–202, as follows:

"The following persons can not be witnesses: . . . .

"3. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any communication, or agreement, not in writing, occurring before the death of such deceased person."

The amendment limits the prohibition of the statute to testimony "as to any communication, or agreement, not in writing, occurring before the death of such deceased person." Respondent was competent to testify as to services performed by him for deceased and as to the value thereof, and we approve the finding of the trial judge to the effect that the evidence is sufficient to establish respondent's claim against the estate for $1,000 for services rendered to deceased, and in caring for his property, from 1931 until his death.

■ The will contains a list of property which belonged to decedent, at the time it was executed, including a tractor, a plow and a scraper, which were not listed in the inventory of the estate nor mentioned in the account. Appellant objected and excepted to the account and specified its failure to show respondent, as executor, had taken possession of this machinery. Respondent's testimony shows he had loaned White $500 and, in 1934, in consideration of the cancelation of the debt, White sold him the machinery. The evidence is sufficient to sustain the finding by the trial judge to the effect that the tractor, plow and scraper were sold to respondent by White and were not a part of the estate.

■ The failure of the trial judge to find that respondent acted unlawfully in renting lands belonging to the estate, to J. C. Anderson, in 1937, is assigned as error. It appears that the land was leased to Anderson in 1936 for one year; that both Anderson and respondent were under the impression the lease was for three years and that in 1937 the tenant was permitted to continue in possession, without a new lease being executed, and without the approval of the probate judge. It further appears the same amount of rent has been collected for 1937 as for 1936, and it has not been shown to be inadequate, nor that the estate has suffered in any way by respondent's oversight in failing to execute a formal lease and to have the transaction approved by the probate judge. This assignment of error is without merit.

■ A claim for $14.93 was filed against the estate by Foster & Allen, contractors of North Wilkesboro, North Carolina, for architect's services. It is itemized and is verified as follows:

*"Be it Known:* That K. M. Allen personally appeared before me this day and on being sworn says, That at the time the foregoing account of Geo. A. White, deceased late of Wilkes County, North Carolina was made he was Bookkeeper for J. F. Allen and T. M. Foster trading and doing business under the partnership name of Foster and Allen with the principal Office in North Wilkesboro, N. C., and that the foregoing is a true and accurate copy of the Account of said George A. White as it appears on their Books

"K. M. ALLEN"

The claim is dated December 5, 1936, and is sworn to before a notary public. Testimony was introduced to the effect that the original, or a duplicate, of this claim was filed with, and approved by, the probate judge and has been lost. Section 15-605 contains the following:

"Every claim which is due, when presented to the executor or administrator, must be supported by the affidavit of the claimant, or some one in his behalf, that the amount is justly due, that no payments have been made thereon which are not credited, and that there are no offsets to the same, to the knowledge of the affiant. . . . . "

While the verification does not strictly conform to the requirements of our statute, it is sufficient to justify the allowance of credit to the executor for having paid the claim, in the absence of a showing that the estate has suffered loss by reason of its payment.

In his account, respondent, as executor, reported:

"That on the 13th day of March, 1936, the testator entered into a 'Lease and Option to Purchase' and 'Contract for Purchase' with George S. Smith for the East Half (E½) of Lot Three (3) East of Canal, Section One (1), Township 1 North, Range 38, E. B. M., Bonneville County, Idaho, for an annual rental of $500.00; that at the time said lease was executed to-wit, March 13, 1936, the said George S. Smith made an advance payment for the 1936 rent of $300.00; that on said 13th day of March, 1936, your Executor, acting as attorney in fact for the deceased paid to the First Security Bank of Idaho Falls, Idaho, the sum of $300.00 as part payment on a $400.00 note which the deceased owed said bank; that thereafter, and as above set forth, your Executor col-

lected from said George S. Smith on June 23, 1936, $150.00, and on November 16, 1936, $50.00; that these two items together with the $300.00 above referred to, fully paid the rent on said premises leased by said George S. Smith for the year 1936.''

The above-quoted part of the account is erroneous in that the record shows the $300 collected from Smith, March 13, 1936, was not applied on the $400 note, but that $200 of it was deposited in White's account in the bank and $100 of it was retained by respondent; also, that the $400 note and interest thereon, were paid by check on White's account. With respect to this $300 item, respondent testified:

''Question: I will ask you, Mr. Ball, whether or not you did in fact, on the 13th of March, 1936, pay to the First Security Bank the sum of $300, as part payment of a $400 note? . . . .

''A. As I remember, I did.

''Q. And any more?

''A. Any more than—

''Q. The $300?

''A. At this particular time?

''Q. Yes.

''A. Not that I remember.

''Q. Mr. Ball, don't you remember in the hearing downstairs you testified you paid this by a check, $400, plus interest?

''A. Well, I didn't understand your previous question. What was it?

''Q. I want to be fair with you on that, of course. (Mr. Ray then handed a bank statement sheet to the witness, who examined the same.)

''Q. Now, Mr. White [Mr. Ball], you say in your report that on the 13th of March, 1936, you collected $300 from a fellow by the name of George S. Smith, and on that date you paid a note of Mr. White's at the bank—you applied that $300 upon that note of Mr. White's at the First Security Bank here. Now, I ask you if that is correct? . . . .

''A. I paid the note of $406.50 on that date. . . . .

''Q And how did you pay it?

''A. I don't remember.

"Q. Are you positive that you used this $300 that you collected from Mr. Smith on that date, to apply upon the payment of this note?

"A. I don't remember.

"Q. What did you do with that $300?

"A. Well, I think I deposited it in the bank.

"Q. What bank?

"A. The First Security.

"Q. All of it?

"A. Yes sir.

"Q. The $300?

"A. Yes sir.

"Q. To what account?

"A. G. A. White.

"Q. Now, Mr. Ball, just be fair, and refresh your memory with anything that you may have, so that we may be certain about that. I think you are in error in your memory, and we want to be certain about that, as to what you did with this $300?

"A. No; I can't remember.

"Q. If I should show you a deposit slip of the First Security Bank, do you think that would refresh your recollection?

"Mr. R. D. MERRILL: Mr. Ray, is that a deposit slip, or is it simply some copy somebody made?

"Mr. RAY: A copy we had the bank make. . . . .

"Mr. RAY: Is that any assistance to you, Mr. Ball, in refreshing your recollection as to what you did with that money you collected— . . . .

"A. The only thing I remember that date is that I paid a $400 note.

"Q. But you don't know how it was paid, whether by check or by cash?

"A. I said a moment ago I thought I paid it by check.

"Q. Upon George A. White's account?

"A. Yes.

"Q. You had authority at that time to sign checks upon his account at that bank?

"A. Yes sir.

"Q. Would you say that if a check passed through the George A. White account on March 13th, 1936, in the sum of

$406.50, that that was the check you are referring to, Mr. Ball.

"A. I would think so. That was the amount of the note and the interest.

"Q. Now, once again, Mr. Ball: Did you not on the 13th of March, 1936, deposit $200 of the $300 which you obtained from Mr. Smith in the First Security Bank of Idaho Falls to the account of George A. White, and retain $100 in cash yourself? . . . .

"A. I don't remember.

"Q. Would you say that you didn't do that?

"A. No. I don't remember. . . . .

"Q. Handing you Contestant's Exhibit 'H,' for identification, Mr. Ball, I will ask you to state generally what that purports to be?

"A. (Examining Exhibit 'H') Well, it's a deposit slip, receipt for deposit to G. A. White.

"Q. And is that the slip of deposit for the check, this Exhibit here (indicating), Exhibit 'G'?

"A. (Examining Exhibits 'G' and 'H') I would suppose so. It's dated both the same date.

(Exhibit 'G' is the $300 check of George S. Smith, dated March 13, 1936, in favor of Leonard Ball.)

"Q. Is that your name appearing thereon (indicating Exhibit 'H')?

"A. That's my initial and name, yes sir.

"Q. That's your signature? That is, you signed it?

"A. Yes sir. . . . .

"Q. Now, Mr. Ball, Contestant's Exhibit number 'H' shows that on the 13th day of March, 1936, you received in cash from the First Security Bank of Idaho Falls $100 upon the deposit of a $300 check on that day, made by George S. Smith. What explanation have you of what was done with that money?

(Mr. Ray then handed Exhibit 'H' to the witness, who examined same.)

"A. This bank record shows that I took a check to the bank for $300, and deposited $200, and received $100 cash; but, I don't remember the transaction, never, until I saw this slip.

"Q. Do you say that it is not true?

"A. No sir.

"Q. Then you have no explanation to offer except you don't remember the transaction?

"A. I will make this explanation: The date of this transaction was about the time that I went to North Carolina to see Mr. White, and if I received that $100 cash I know that I spent it for the interests of Mr. White or his estate.

"Q. In taking your trip to North Carolina?

"A. I don't know where—I don't know where I spent it; I can't remember. . . . .

"Q. You have put in a claim for your expenses on that trip?

"A. Yes sir. I may say to the court here now that this item very much embarrasses me, in so much that I can't remember or explain where—exactly what I did with that $100, where I spent it. And that's the only item. But, I know that whatever I did with it, I spent it for—either for Mr. White, or for his interests, because I never used a dollar of that money for myself, personally. . . . .

"Q. Now, in regards to the deposit slip, counsel asked you— No. I will withdraw that question. Do you remember of getting the $100 that's listed on this deposit slip (indicating Exhibit 'H')?

"A. I have tried my best to remember that transaction, and all that I can remember about it is taking the check to the bank and paying a certain note, and I don't remember of getting the money. But, the record shows I got it, and I can't deny it.

"Q. Well, as far as you can recall, then, you don't know whether you got it, or not; is that what you are trying to say?

"A. No; I am just trying to say that I don't remember.

"Q. Don't remember of ever getting the $100?

"A. I don't remember the transaction.

"Q. Well, did you—have you ever used any of Mr. White's money for your personal affairs?

"A. No sir."

The $300 item, collected from Smith by respondent for White, prior to the death of the latter, having been incorporated in the executor's report, and objected to, is properly

before the court for consideration. One hundred dollars of it, not having been deposited to White's credit, but having been retained by respondent, the burden was on him to prove it was used for the benefit of White, in his lifetime, or for the benefit of his estate after his death. (Bancroft's Probate Practice, vol. 3, sec. 993, p. 1676.) It was respondent's duty, if he had not used the $100 for the benefit of White, during his lifetime, to include it as a claim against himself in the inventory of White's estate. Section 15–405 provides:

"The naming of a person as executor does not thereby discharge him from any just claim which the testator has against him, but the claims must be included in the inventory, and the executor is liable for the same, as for so much money in his hands, when the debt or demand becomes due."

This money came into respondent's hands March 13, 1936, and White died on the 27th of that month. While, ordinarily, a man might be expected to remember a transaction of this kind, which occurred so recently prior to the commencement of his duties as executor, we are not prepared to say it had not so completely escaped respondent's memory that he was unable to recall it. If he, acting as attorney-in-fact for White, used the money for the latter's benefit, he should have made a record of it. The bank records show the money went into his possession and he is unable to show, satisfactorily, what he did with it. The nearest he has come to accounting for it is where he says:

"I will make this explanation: The date of this transaction was about the time that I went to North Carolina to see Mr. White, and if I received that $100 cash I know that I spent it for the interests of Mr. White or his estate."

Respondent's claim for $125 for expenses incurred by him in making that trip has been allowed against the estate, and paid.

It has been established that $100 of White's money came into respondent's hands shortly prior to the former's death and I cannot accept, as an accounting, his statement that he does not know what he did with it and does not remember the transaction. To do so would establish a precedent for the results of which I am unwilling to be responsible. The

finding to the effect that the $100 was used for White's benefit, and that respondent is not chargeable with it, should be disapproved.

For a considerable length of time prior to his death, White was an invalid and unable to care for himself. During a part of that time he resided in the home of, and was cared for by, Della Eller, at Spurgeon, North Carolina. After White's death she wrote respondent a letter, as follows:

"Spurgeon, N. C.
"May 4, 1936

"Dear Mr. Ball,

"Hope you are feeling fine and getting along alright. As I haven't heard from you for some time just thought I would write a few lines to tell you that Mr. White left owing me ($20.00) twenty Dollars Treva Johnston three dollars ($3.00) and Genie Rash two dollars ($2.00)  Now I would not have written to you about the $20.00 if I hadn't just needed the money but I do need the money very bad. Mr. White's things are here yet his folks haven't come after them yet.

"Sincerely
"DELLA ELLER."

On the letter appears the following endorsements:

"Allowed Nov. 17 1936 Leonard G. Ball Executor

"Approved 18 day Nov. 1936 for $2.00 W. D. Huffaker Probate Judge."

The seal of the Probate Court of Bonneville County, Idaho, is affixed. The letter was treated as a claim against the estate and was paid by respondent, who claims credit therefor.

In the findings of fact the following appears:

"The court further specifically finds that the Della Eller claim for $25.00 is for nursing and care of deceased during his last illness; that this claim has been allowed and paid, although not properly presented and sworn to. The evidence shows that the claim was reasonable and justly due and owing, and appellant should be allowed credit therefor, and that the contestant's objection thereto is groundless."

Respondent relies on Bancroft's Probate Practice, volume 3, page 1651, section 975, wherein it says:

"Payments made on claims not presented as required by law for allowance and approval may nevertheless be credited to the representative on settlement of his accounts, under the statutes in several states, upon making certain proof. . . . . "

In support of the text there is cited statutes of Arizona, California, Montana, North Dakota, Oklahoma, South Dakota and Utah, which have been examined and found to sustain the statement made with respect to them. The laws of these states differ from ours in this: we have no statutory authority for allowing or paying claims which do not substantially conform to sec. 15–605.

The Della Eller claim should not have been allowed, and respondent should be charged with the $100, which came into his hands when he cashed the $300 check of George S. Smith, which belonged to White, and which was not applied toward the payment of White's $400 note, as reported. However, this conclusion does not coincide with the views of the majority of the court, with respect to these two items, which views are set out in the following opinion by Justice Budge.

Givens, J., concurs.

BUDGE, J., Concurring in Part and Dissenting in Part.— I concur in the opinion of Morgan, J., except as hereinafter pointed out:

In Mr. Ball's account as executor the following appears:

"That on the 13th day of March, 1936, the testator entered into a 'Lease and Option to Purchase' and 'Contract for Purchase' with George S. Smith for the East Half (E½) of Lot Three (3) East of Canal, Section One (1), Township 1 North, Range 38, E. B. M., Bonneville County, Idaho for an annual rental of $500.00; that at the time said lease was executed, to-wit, March 13, 1936, the said George S. Smith made an advance payment for 1936 rent of $300.00; that on said 13th day of March, 1936, your Executor, acting as attorney in fact for the deceased paid to the First Security Bank of Idaho Falls, Idaho, the sum of $300.00 as part payment on a $400.00 note, which the deceased owed said bank; that thereafter, and as above set forth, your Executor collected from said George S. Smith on June 23, 1936, $150.00,

and on November 16, 1936, $50.00; that these two items together with the $300.00 above referred to, fully paid the rent on said premises leased by said George S. Smith for the year 1936.''

It is evident from a careful reading of the above recital that it was the intention and sole purpose of Mr. Ball to account, as executor, for the $150 and the $50 that came into his hands as such executor, as money belonging to the White estate; and, in order to explain the transaction, he called attention to the fact that Smith was to pay an annual rental of $500 and that the same was paid, $300 to him, Ball, while acting under power of attorney, and $200 that came into his hands while acting as executor. The $300 that came to Mr. Ball's hands was not subject to investigation further than to show what portion remained unexpended and came into his hands as executor. To hold otherwise, he would be required to account for all moneys coming into his hands and expended while acting under power of attorney. If any one item may be inquired into, all moneys received by him in such capacity and expended would be subject to investigation.

Timely objection was made to the admissibility of any testimony touching the $100 item, for the reason that if received by Mr. Ball it was not received by him as executor but while he was acting for Mr. White under power of attorney. The power of attorney was executed on the 9th day of June, 1935, and among other things, contains the following recital:

''KNOW ALL MEN BY THESE PRESENTS, That G. A. White of Idaho Falls, County of Bonneville, State of Idaho, has made, constituted and appointed and by these presents does make, constitute and appoint Leonard G. Ball of Idaho Falls, Idaho, County of Bonneville, State of Idaho, as true and lawful attorney for George A. White, and in his name & place and stead to rent, lease, sell, to let, execute deeds, collect rents, issue checks, authority to transact any business pertaining to my property. giving and granting unto Leonard G. Ball, said attorney, full power and authority to do and perform all and every act and thing whatsoever required and necessary to be done in and about the premises as

fully, and to all intents and purposes as George A. White might or could do if personally present, hereby ratifying and confirming all that Leonard G. Ball said attorney shall lawfully do or cause to be done by virtue hereof.''

Mr. Ball acted under the above power of attorney from the 9th day of June, 1935, until the death of White on the 27th day of March, 1936. Mr. White's estate was inventoried at $14,566.64, consisting of farms, personal property, outstanding notes and mortgages, etc. No doubt Mr. Ball made many deposits, drew many checks against Mr. White's account and paid many bills during the time that he was acting for Mr. White under power of attorney. In other words, Mr. Ball, while acting under power of attorney, stood in Mr. White's shoes, with authority to do anything and everything that Mr. White himself may or could have done, without any restrictions or limitations. Being possessed of such broad authority, he had a right, if he so desired, to withdraw the $100 in question and to expend it in the interest of Mr. White or Mr. White's estate, just the same as Mr. White himself may have done, and he was no more accountable to anyone than Mr. White would have been.

The sole and only purpose of the statement above set out was to inform the probate judge that the balance of the $500 had been collected subsequent to Mr. White's death and was properly accounted for. The mere fact that, in making his report, Mr. Ball reported that $300 received by him prior to Mr. White's death had been applied on a note of $400, is immaterial, since it clearly appears that the $400 plus interest was paid by Mr. Ball and $200 of the $300 collected was likewise accounted for. Even conceding that the court did not err in admission of testimony with reference to the $100, the court found, and there is sufficient competent evidence to sustain the finding:

"That as to the claim of $100.00 which came into the possession of the appellant during the life time of the decedent, was used by appellant for the use and benefit of the deceased during his life time; that said appellant is not chargeable with said $100.00.''

In reference to this $100, Mr. Ball testified:

" . . . . Q. Do you remember of getting the hundred dollars that's listed on this deposit slip?

"A. I have tried my best to remember that transaction, and all that I can remember about it is taking the check to the bank and paying a certain note, and I don't remember of getting the money. But, the record shows I got it, and I can't deny it.

"Q. Well, as far as you can recall, then, you don't know whether you got it, or not, is that what you are trying to say?

"A. No; I am just trying to say that I don't remember.

"Q. Don't remember of ever getting the hundred dollars?

"A. I don't remember the transaction.

"Q. Well, did you—have you ever used any of Mr. White's money for your personal affairs?

"A. No sir."

And in this connection, Mr. Ball testified further:

"I know that whatever I did with it, I spent it for— either for Mr. White, or for his interests, because I never used a dollar of that money for myself, personally."

There is no competent evidence in the record that disputes this testimony of Mr. Ball. There is not a single suspicious act or circumstance reflecting upon Mr. Ball's honesty or integrity, while acting as executor. The court found that Mr. Ball had truly, faithfully and fairly administered said estate and that he had given a true and correct account and report of all moneys and properties that came into his hands during his administration, up to June, 1937, the date he filed his report. The trial court did not err in refusing to award judgment against Mr. Ball for the $100, for the reason that the evidence admitted with relation thereto was incompetent and inadmissible, being wholly immaterial to the settlement of Mr. Ball's account as executor; and for the further reason that there is sufficient evidence to support the court's finding that Mr. Ball did not receive or use the $100 for his own personal use or benefit.

Coming now to the claim of Della Eller et al.: On May 4, 1936, subsequent to Mr. White's death, Della Eller addressed a letter to Mr. Ball, in which she informed the latter in substance: That Mr. White left owing her $20 and

owing one Johnston, $3, and one Rash, $2. When Mr. Ball took Mr. White to Charlotte, North Carolina, Mr. White being ill, he left him at the home of Della Eller, who cared for Mr. White during his last illness and up until his death. Della Eller was not related to Mr. White but he preferred to stay with her rather than with relatives. While it is conceded that the claim is not verified under the statute, the trial court found specifically that Della Eller's claim was for nursing and caring for deceased during his last illness. The evidence shows that the claim was reasonable and justly due and owing and appellant should be allowed credit therefor and the contestant's objections thereto are groundless.

The will contains the following provision:

"6. I direct that my executor first, to pay all expenses incurred by sickness and burial out of funds that are available, and all expenses of settling the estate."

Section 15–801, I. C. A., provides:

"No person has any power as an executor until he qualifies, except that, before letters have been issued, he may pay funeral charges and take necessary measures for the preservation of the estate."

Section 15–1127, provides as follows:

"The executor or administrator, as soon as he has sufficient funds in his hands, must pay the funeral expenses and the expenses of the last sickness, and the allowance made to the family of the decedent. He may retain in his hands the necessary expenses of administration, but he is not obliged to pay other debts or any legacy until, as prescribed in this chapter, the payment has been ordered by the court."

"Funeral expenses are not properly a 'claim' against the estate in the sense of being an obligation contracted or incurred by the decedent. Neither are they expenses of administration. They are rather a charge against the estate which the law authorizes because of the dictates of society. The same is essentially true of expenses of the last sickness." (Bancroft, Prob. Prac., p. 1391, sec. 780.)

Mr. Ball as executor carried out literally the instructions contained in the will when he paid the $20 to Della Eller and $3 to Johnston and $2 to Rash. (Sec. 15–1114, I. C. A.)

It would be unjust and inequitable to require Mr. Ball to repay this money to the estate for the benefit of contestant.

The judgment of the trial court is affirmed.

Ailshie, J., concurs.

HOLDEN, C. J. (Dissenting and Concurring).—After my first examination of this case, Mr. Justice Budge wrote the foregoing opinion, concurring in part and dissenting in part. The matters to which he directs attention were not pointedly stressed by counsel, and therefore escaped my notice. I have again carefully examined the record in the light of Justice Budge's opinion and concur therein, although I still concur in the opinion of Justice Morgan on all other questions.